******************************************************
The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it is
released as a slip opinion. The operative date for the
beginning of all time periods for filing of postopinion
motions and petitions for certification is the "officially
released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the version appearing in the Connecticut Law
Journal and subsequently in the Connecticut Reports or
Connecticut Appellate Reports, the latest version is to be
considered authoritative.

The syllabus and procedural history accompanying an
opinion that appear in the Connecticut Law Journal and
subsequently in the Connecticut Reports or Connecticut
Appellate Reports are copyrighted by the Secretary of the
State, State of Connecticut, and may not be reproduced or
distributed without the express written permission of the
Commission on Official Legal Publications, Judicial
Branch, State of Connecticut.
******************************************************

# WESTCHESTER MODULAR HOMES OF FAIRFIELD COUNTY, INC. *v.* ARBELLA PROTECTION INSURANCE COMPANY
## (AC 45433)

Alvord, Elgo and Keller, Js.

*Syllabus*

The plaintiff insured appealed to this court from the summary judgment rendered in favor of the defendant insurance company, claiming that the trial court improperly concluded that the defendant had no duty to defend the plaintiff against a counterclaim filed by third-party homeowners in an action arising out of a contract for the construction of a modular home. During construction, disputes arose between the plaintiff and the homeowners, and the homeowners ultimately terminated their contract with the plaintiff. The plaintiff filed a mechanic's lien on the property and commenced an action to foreclose on the lien. The homeowners filed a counterclaim, alleging that the plaintiff had breached the construction contract in various ways, including by performing work that was substandard, unreasonable, and unworkmanlike. Several months later, the homeowners disclosed M, a licensed architect and professional engineer, as an expert witness. During M's deposition by the plaintiff's attorney, M testified that the windows in the home were not installed with pan flashing, which was a building code violation and would allow water to leak down between the window and the siding and rot the wall. He further testified that the repairs required to correct the issue would cost the homeowners a considerable amount of money. Three weeks after M's deposition, the attorney for the homeowners sent the plaintiff's attorney an email informing the plaintiff that M had further investigated the issues about which he had testified and concluded that the windows were installed with pan flashing but that it was not installed correctly, which, along with other allegedly defective work by the plaintiff, would result in water condensation and eventually water damage to the roof if the issues were not remedied. The plaintiff filed a claim for coverage under a commercial general liability policy issued to it by the defendant. The plaintiff also submitted to the defendant documents from the underlying litigation, including the homeowners' counterclaim, the expert witness disclosure of M, the transcript of M's deposition, and the email regarding M's further investigation of the issues. The defendant acknowledged receipt of the materials submitted by the plaintiff. One month later, the defendant issued a disclaimer of coverage and reservation of rights to the plaintiff stating, inter alia, that the operative counterclaim filed in the underlying litigation did not allege "property damage" caused by an "occurrence" as defined by the insurance policy and, therefore, it did not trigger coverage under the policy. Prior to the trial in the underlying litigation, the plaintiff and the homeowners agreed to arbitrate their claims. The plaintiff prevailed in the arbitration and received an award in its favor. The plaintiff subsequently commenced the present action against the defendant, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Both parties filed motions for summary judgment, and, after oral argument, the trial court issued a memorandum of decision in which it denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment. With respect to the plaintiff's breach of contract claim, the court determined that the pleadings in the underlying litigation did not allege property damage and that the extrinsic documents submitted to the defendant by the plaintiff established only the existence of possible defective work that could lead to future property damage if not remedied but that they did not demonstrate the existence of current property damage that would trigger the defendant's duty to defend. *Held* that the plaintiff could not prevail on its claim that the trial court improperly granted the defendant's motion for summary judgment: contrary to the plaintiff's argument, the homeowners' counterclaim alleged contract damages and construction defects and did not allege that the defects caused damage to other, nondefective property or that

there was property damage of any kind; moreover, M's deposition testimony did not trigger a duty to defend because it did not suggest that property damage had, in fact, occurred, but rather it suggested that he had identified defective work that, if not remedied, could lead to property damage in the future; furthermore, the plaintiff did not present this court with any case law holding that the presence of water, in the absence of actual damage, amounts to covered physical damage that would trigger a duty to defend, and, thus, the plaintiff's notification of the mere presence of water, without the necessary resulting physical injury to tangible property, did not provide the defendant with actual knowledge of facts establishing a reasonable possibility of coverage because the presence of water did not constitute property damage within the terms of the policy.

Argued January 3—officially released April 2, 2024

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the court, *Shaban, J.*, denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*Anita C. Di Gioia*, for the appellant (plaintiff).

*Ashley A. Noel*, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiff, Westchester Modular Homes of Fairfield County, Inc., appeals from the summary judgment rendered in favor of the defendant, Arbella Protection Insurance Company. On appeal, the plaintiff claims that the court improperly concluded that, pursuant to a commercial general liability policy, the defendant had no duty to defend the plaintiff against a counterclaim filed by a third party in an action arising out of a contract for the construction of a modular home. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which are undisputed, and procedural history are relevant to our resolution of this appeal. On or about April 27, 2016, the plaintiff entered into a contract with Diana Lada L'Henaff and Jean Jacques L'Henaff for the construction of a new modular home on property located in New Canaan (property). During construction, disputes arose between the L'Henaffs and the plaintiff. Ultimately, the L'Henaffs terminated their contract with the plaintiff on December 14, 2016. The plaintiff filed a mechanic's lien on the property on or about February 3, 2017, and commenced an action to foreclose on the lien on or about April 7, 2017 (underlying litigation).

The L'Henaffs filed a counterclaim in the underlying litigation. In their operative first revised counterclaim, filed on August 22, 2017, the L'Henaffs alleged, in relevant part, that they "desired to build a modern home and had very carefully and specifically specified the type of insulation, materials, and finishes that they required the builder that won the job to satisfy." The L'Henaffs alleged that prior to signing the contract, the plaintiff "often responded to [their] frequent queries in a manner that revealed its lack of knowledge, experience, and expertise with modern construction." The L'Henaffs alleged that "work on the project progressed slowly and with constant problems." The L'Henaffs alleged that the plaintiff had breached the construction contract by: "[f]ailing to complete construction within the time set forth in the construction contract . . . [f]ailing to complete construction in accordance with the plans and specifications incorporated by reference into the construction contract . . . [p]erforming work that was substandard, unreasonable, and unworkmanlike . . . [d]isregarding [the L'Henaffs'] repeated requests for timelines to complete . . . [d]isregarding [the L'Henaffs'] repeated requests for materials that complied with the plans and specifications to review and approve . . . [f]ailing to construct the building in accordance with the approved plans . . . [m]aking material changes to the building design layout without consulting [the L'Henaffs] . . . [f]ailing to ensure proper plumbing connections were used throughout the building . . . [f]ailing to take reasonable steps to ensure that construction

progressed in a timely manner . . . [f]ailing to complete rough electrical and plumbing in accordance with plans . . . [f]ail[ing] to provide hardware, lighting, and various other finishes for which [the plaintiff] charged [the L'Henaffs] . . . [f]ail[ing] to properly construct boulder retaining wall . . . [f]ail[ing] to construct walls that were true and plumb; and . . . [f]ail[ing] to properly complete site work." The L'Henaffs alleged in their counterclaim that, "[a]s a direct and proximate result of [the plaintiff's] material breach of the terms of the construction contract, the [L'Henaffs have] suffered, and will continue to suffer, damages to be ascertained at trial."

Also in the underlying litigation, in a June 29, 2018 supplemental disclosure of expert witness, the L'Henaffs disclosed Carl Mezoff, a licensed architect and licensed professional engineer. The disclosure stated that Mezoff was expected to testify, inter alia, "about his opinions concerning the construction work performed by the plaintiff and its agents, the timeliness of said work, the processes employed by the plaintiff in connection with its work and planning, the status of the work performed by the plaintiff as of the date of termination, the quality of workmanship of the work performed by the plaintiff as of the date of termination, [and] the work performed by third parties after the termination of the plaintiff that was within the scope of the plaintiff's contract, including the plaintiff's allegations pertaining to the costs incurred by the [L'Henaffs] to both repair work performed by the plaintiff and complete work left incomplete by the plaintiff."[1]

On August 1, 2018, the plaintiff's attorney deposed Mezoff regarding the condition of the property. In his deposition, Mezoff testified that "one of the major problems that we've run into or at least discovered is that the windows are improperly installed in this building . . . ." Specifically, Mezoff testified that "[t]he windows were not installed with pan flashing. There's no pan flashing under the windows. That's a building code violation, and that *will* allow water to leak down between the window and the siding and rot the building below. So to correct that, they're going to have to pull out all the windows, reflash them, reinstall the windows, and that's a considerable cost." (Emphasis added.) He further explained: "Because there's no pan flashing, *if* water gets past my finger there, it's going to get into the wall and rot the wall." (Emphasis added.)

Three weeks after Mezoff's deposition, on August 21, 2018, the L'Henaffs' attorney sent the plaintiff's attorney an email informing the plaintiff that Mezoff had "investigated further the issues related to the window flashing and insulation in the ceiling that he testified about" (August, 2018 email). The August, 2018 email states that Mezoff has concluded that "the windows were installed with pan flashing, however, the flashing does not extend out over the second layer of exterior foam insulation;

water, therefore, is being directed between the two foam layers, and as a result, water is, and will continue, to collect in the soffit areas." The email also states that Mezoff "has opened the ceiling and discovered (a) there is no insulation in the drop ceiling on the second floor, and (b) there is no vapor barrier between the bottom of the open cell insulation and the top of the drywall in the ceiling finished by the factory. Therefore, the ceiling is not code compliant, and the lack of a vapor barrier will result in water condensation, thus resulting in water damage to the roof structure if not remedied. Further there is insufficient insulation both to meet code and to comply with the contract. Please advise when you would like to re-depose him."[2]

In September, 2018, the plaintiff, as a named insured under a commercial general liability policy issued by the defendant (policy), filed a claim for coverage with the defendant. The policy's general insuring provision states in relevant part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result."

The following definitions in the policy, which we discuss subsequently in more detail, are relevant to our analysis.

"13. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. . . .

"17. 'Property damage' means:

"a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

"b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

In connection with its claim for coverage, on September 11, 2018, the plaintiff submitted to the defendant certain pleadings from the underlying litigation, including the L'Henaffs' first revised counterclaim, the plaintiff's reply to the L'Henaffs' special defenses and answer to the counterclaim with its own special defenses, a second amended complaint, the L'Henaffs' answer to the amended complaint, the supplemental disclosure of expert witness, and a supplement to a motion for continuance. The plaintiff also submitted to the defendant Mezoff's deposition transcript and the August, 2018

email. The defendant acknowledged receipt of the materials submitted by the plaintiff.

On October 15, 2018, the defendant issued a disclaimer of coverage and reservation of rights to the plaintiff. The defendant disclaimed coverage, inter alia, on the basis that the first revised counterclaim filed in the underlying litigation did not allege "property damage" caused by an "occurrence" and, therefore, it did not trigger coverage under the policy. (Internal quotation marks omitted.)

Prior to trial in the underlying litigation, the plaintiff and the L'Henaffs agreed to arbitrate their claims. The plaintiff prevailed in the arbitration and received an award in its favor on July 6, 2020.[3]

In October, 2020, the plaintiff commenced the present action against the defendant alleging breach of contract and breach of the implied covenant of good faith and fair dealing. In count one, the plaintiff alleged, inter alia, that the policy obligated the defendant to provide a defense to the plaintiff when presented with a claim to which the policy may apply. The plaintiff alleged that it timely provided the defendant with information demonstrating that the defendant was obligated to defend the plaintiff in the underlying litigation and, thus, the defendant's disclaimer of coverage constituted a breach of the policy. The plaintiff alleged that it suffered damages in excess of $500,000 in the form of defense costs incurred in the underlying litigation.

In count two, the plaintiff alleged that, "[d]espite the plaintiff providing the defendant with voluminous documents and information that demonstrated that the plaintiff was entitled to a defense and indemnification under the policy when the L'Henaffs refined and amplified their claim in the summer of 2018, the defendant relied exclusively on the revised counterclaim from the underlying litigation dated August 22, 2017, to disclaim coverage." The plaintiff alleged that the defendant's failure to consider the materials was purposeful and arose out of the defendant's dishonest purpose to deny coverage.

The defendant filed an answer and special defenses, asserting, inter alia, that coverage was not triggered by the policy or was excluded pursuant to certain of the policy's exclusions. The plaintiff denied the defendant's special defenses.

On September 9, 2021, the plaintiff filed a motion for summary judgment on liability as to count one of its complaint alleging breach of contract, a memorandum of law in support thereof, and exhibits. The plaintiff argued that there existed no genuine issue of material fact that the defendant had a duty to defend under the policy and the exclusions to coverage did not apply. Specifically, the plaintiff contended that the pleadings from the underlying litigation when considered together with Mezoff's deposition transcript and the August, 2018

email demonstrated that the L'Henaffs were claiming that the plaintiff's defective work "was damaging work that was not itself defective," thus triggering the defendant's duty to defend.

On September 10, 2021, the defendant filed its own motion for summary judgment, accompanied by a memorandum of law and supporting exhibits, as to both counts of the plaintiff's complaint. Therein, the defendant argued that it "did not have a duty to defend the plaintiff against the revised counterclaim in the underlying [litigation]. The revised counterclaim did not allege 'property damage' caused by an 'occurrence' and therefore did not trigger coverage under the applicable policy. Extrinsic documents submitted by the plaintiff to [the defendant] in support of its claim for coverage similarly did not raise the possibility of coverage under the policy. Furthermore, even if coverage was initially triggered, coverage was precluded by certain policy exclusions. As a result, [the defendant] did not have a duty to defend the plaintiff and therefore did not breach the policy." The defendant also argued that, because the plaintiff cannot recover for common-law bad faith where there exists no wrongful denial of benefits under the policy, it was entitled to judgment as a matter of law on count two of the plaintiff's complaint.

Both parties filed memoranda of law in opposition to summary judgment, and the plaintiff filed a reply to the defendant's opposition. The court, *Shaban, J.*, heard oral argument on both motions for summary judgment on December 6, 2021.

On March 29, 2022, the court issued a memorandum of decision in which it denied the plaintiff's motion for summary judgment and granted the defendant's motion for summary judgment. With respect to count one of the plaintiff's complaint, the court determined that the pleadings in the underlying litigation did not allege property damage. As to the extrinsic documents submitted to the defendant by the plaintiff, the court determined that such evidence established only the existence of possible defective work that could lead to future property damage if not remedied but that it did not demonstrate the existence of current property damage. Because it concluded that "neither the pleadings nor the other extrinsic documents provided to [the defendant] by [the plaintiff] in the underlying litigation allege or provide actual knowledge that property damage, [affecting] other nondefective property, resulted from an occurrence that triggered coverage and a duty to defend," the court did not need to consider whether coverage was barred under any exclusions to the policy. With respect to count two of the plaintiff's complaint, the court determined that the plaintiff could not recover on its claim alleging a breach of the covenant of good faith and fair dealing because there was no wrongful denial of coverage under the policy. This appeal followed.[4]

We first set forth our standard of review and relevant legal principles. "Whether the trial court properly rendered summary judgment in favor of the defendant is a question of law subject to our plenary review. . . . Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Citation omitted; internal quotation marks omitted.) *Nash Street, LLC* v. *Main Street America Assurance Co.*, 337 Conn. 1, 8, 251 A.3d 600 (2020).

Because there are no factual issues in dispute in the present case, the legal question is whether the defendant had a duty to defend the plaintiff. "The question of whether an insurer has a duty to defend its insured is purely a question of law . . . . An insurer's duty to defend is determined by reference to the allegations contained in the [underlying] complaint. . . . The duty to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether [the complaint] stated facts which bring the injury within the coverage. . . . If an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured. . . . That being said, an insurer has a duty to defend only if the underlying complaint *reasonably* alleges an injury that is covered by the policy." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Stewart* v. *Old Republic National Title Ins. Co.*, 218 Conn. App. 226, 240, 291 A.3d 1051 (2023).

Moreover, "[a]n insurer may be obligated to provide a defense not only based on the face of the complaint but also if any facts known to the insurer suggest that the claim falls within the scope of coverage. . . . Where the insurer has sufficient knowledge to show that a claim falls within coverage even though not properly pleaded to [invoke] coverage, the carrier cannot make the face of the complaint argument . . . . [W]e should not employ a wooden application of the four corners of the complaint rule [that] would render the duty to defend narrower than the duty to indemnify and . . . the sounder approach is to require the insurer to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage. . . . After

all, the duty to defend derives from the insurer's contract with the insured, not from the complaint." (Citations omitted; internal quotation marks omitted.) *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, 274 Conn. 457, 466–67, 876 A.2d 1139 (2005); see also *Misiti, LLC* v. *Travelers Property Casualty Co. of America*, 308 Conn. 146, 161, 61 A.3d 485 (2013) ("[w]e often have stated that the duty to defend must be determined by the allegations set forth in the underlying complaint itself, with reliance on extrinsic facts being permitted only if those facts support the duty to defend"). We will not, however, "predicate the duty to defend on a reading of the complaint that is . . . conceivable but tortured and unreasonable." (Internal quotation marks omitted.) *Stewart* v. *Old Republic National Title Ins. Co.*, supra, 218 Conn. App. 240.

"Our analysis is guided by our usual procedures for interpreting insurance policies. [C]onstruction of a contract of insurance presents a question of law . . . . The [i]nterpretation of an insurance policy . . . involves a determination of the intent of the parties as expressed by the language of the policy . . . [including] what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . [A] contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy . . . [giving the] words . . . [of the policy] their natural and ordinary meaning . . . [and construing] any ambiguity in the terms . . . in favor of the insured . . . .

"The commercial general liability policy is a standard form developed by the Insurance Services Office, Inc., and has been used throughout the United States since 1940. . . . It begins with a broad grant of coverage in the insuring agreement, followed by a series of exclusions (and exceptions to the exclusions) that define the contours of coverage." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 773–74, 67 A.3d 961 (2013) (*Capstone*).

With these principles in mind, we turn to the plaintiff's appeal. In deciding whether the defendant was obligated to defend the plaintiff in the underlying litigation, we begin our analysis with the initial grant of coverage in the policy's insuring agreement, which provides in relevant part: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." The insuring agreement also specifies:

"This insurance applies to 'bodily injury' and 'property damage' only if . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . ."

"Occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policy defines "property damage" as "a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

"b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

On appeal, the plaintiff claims that the court improperly determined that the defendant had no duty to defend the plaintiff in the underlying litigation. The plaintiff contends that it presented the defendant with sufficient information, including the previously discussed extrinsic documents, in support of a potential covered claim. Specifically, the plaintiff argues that the L'Henaffs claimed in the underlying litigation that the plaintiff caused property damage to nondefective property at their house. The defendant responds that neither the allegations of the L'Henaffs' counterclaim nor the extrinsic documents submitted raised the possibility of existing property damage.[5] Specifically, the defendant contends that the extrinsic documents suggested, "at most, that the construction deficiencies *could potentially* result in water damage to nondefective areas of the property *if not fixed*." (Emphasis in original.) Thus, the defendant argues that the court properly determined that it did not have a duty to defend the plaintiff in the underlying litigation.[6] We agree with the defendant.

Our Supreme Court's decision in *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 760, informs our determination of whether the allegations of the revised counterclaim assert property damage. In *Capstone*, the court examined what constitutes property damage under a commercial general liability policy with the same definition as the present policy. See id., 764, 782. The court first noted a lack of "consensus on the meaning of the term property damage in the context of claims for defective work under commercial general liability policies." Id., 777. The court determined, "[o]n the basis of the language of the policy, 'physical injury to tangible property' would not include construction deficiencies unless they damage other, nondefective property." Id., 785. In other words, "the commercial general liability policy covers claims for property damage caused by defective work, but not claims for repair of the defective work itself." Id., 787.

In applying the property damage requirement of the insuring agreement, the court in *Capstone* first noted

that, "[a]lthough the majority of the allegedly defective work involved defective construction, poor quality, or building code violations, without more," the plaintiffs in that case had argued that "assertions made by [the University of Connecticut] that the [p]roject suffered water damage, mold damage, elevated carbon monoxide exposure, cracked piping, and structural problems" clearly involved property damage. (Internal quotation marks omitted.) Id., 779–81. The court stated that "building code violations, defective construction and poor quality control" did not constitute physical injury to tangible property. Id., 783. Additionally, the escape of carbon monoxide, without more, did not constitute property damage because the gas " 'caused no physical, tangible alteration to any property' . . . ." Id., 782. Water damage and mold damage, however, "to portions of the insured's project, beyond the defective work itself," did constitute property damage and, accordingly, the claims based on that physical injury were within the insuring agreement's coverage. Id.

In the present case, the first revised counterclaim alleges construction defects and does not allege damage that the defects caused to other, nondefective property. We agree with the trial court that "[t]he first revised counterclaim provides no allegations concerning defective installation of windows, a defective vapor barrier, water leakage or water damage, or any 'property damage' of any kind." Additionally, the counterclaim's allegation that, "[a]s a direct and proximate result of [the plaintiff's] material breach of the terms of the construction contract, the [L'Henaffs have] suffered, and will continue to suffer, damages to be ascertained at trial" reasonably alleges contract damages, not property damage. See *Stewart* v. *Old Republic National Title Ins. Co.*, supra, 218 Conn. App. 247 ("an insurer has a duty to defend only if the underlying complaint *reasonably* alleges an injury that is covered by the policy" (emphasis in original; internal quotation marks omitted)).

We next consider whether the extrinsic documents submitted to the defendant provided it with " 'actual knowledge of facts establishing a reasonable possibility of coverage.' "[7] *Hartford Casualty Ins. Co.* v. *Litchfield Mutual Fire Ins. Co.*, supra, 274 Conn. 467. The plaintiff relies primarily on two submissions. First, it relies on Mezoff's deposition testimony. Second, it relies on the August, 2018 email from the L'Henaffs' counsel advising the counsel representing the plaintiff in the underlying litigation of the results of Mezoff's further investigation. The defendant acknowledged receipt of this information.

As noted previously, Mezoff testified that "[t]he windows were not installed with pan flashing. There's no pan flashing under the windows. That's a building code violation, and that *will* allow water to leak down between the window and the siding and rot the building

below. So to correct that, they're going to have to pull out all the windows, reflash them, reinstall the windows, and that's a considerable cost." (Emphasis added.) He further explained: "Because there's no pan flashing, *if* water gets past my finger there, it's going to get into the wall and rot the wall." (Emphasis added.)

We conclude that Mezoff's deposition testimony does not trigger a duty to defend because it does not suggest that property damage has, in fact, occurred. Rather, it suggests that he has identified defective work that, if not remedied, could lead to property damage in the future. See *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 785 n.23 ("[r]epairs to structural deficiencies, made for the purpose of preventing [p]hysical injury to tangible property . . . before the alleged deficiency has caused property damage are not within the insuring agreement's definition of property damage" (internal quotation marks omitted)).

The August, 2018 email presents a closer question. The email indicates that Mezoff concluded that "the windows were installed with pan flashing, however, the flashing does not extend out over the second layer of exterior foam insulation; water, therefore, is being directed between the two foam layers, and as a result, water is, and will continue, to collect in the soffit areas."

The plaintiff argues that, taken together, Mezoff's deposition testimony that rot would occur if water leaked into the space below the windows and Mezoff's statement, as reported through counsel in the email, that water was collecting in the soffits, amounts to a "belie[f]" held by Mezoff that "water was entering the area of the exterior walls where the window flashing was defective, collecting, and rotting the 'house' below."[8] The defendant highlights the discrepancy between Mezoff's deposition testimony, wherein he testified that there was "no pan flashing" under the windows, and his discovery, upon returning to the property after his deposition, that "the windows were installed with pan flashing, however, the flashing does not extend out over the second layer of exterior foam insulation . . . ." The defendant contends that Mezoff "effectively retracted his opinions concerning the lack of pan flashing" and, thus, the discovery that flashing was present "mooted all of his testimony regarding the hypothetical future water damage that could result from the lack of pan flashing."[9] The defendant further argues that the plaintiff conflates water collection with water damage. Because there was no indication of water damage, and considering Mezoff's statement that "the lack of a vapor barrier will result in water condensation, thus resulting in water damage to the roof structure if not remedied," the defendant argues that Mezoff opined, at most, that "construction deficiencies could potentially result in water damage to nondefective areas of the property if not fixed." (Emphasis omitted.) According to the defendant, this

possibility of future damage does not qualify as "property damage" under our Supreme Court's decision in *Capstone*.

In construing the phrase "physical injury," our Supreme Court in *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 786–87, quoted *Travelers Ins. Co.* v. *Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 757 N.E.2d 481 (2001), in which the Supreme Court of Illinois stated that " 'physical injury' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." Id., 312; see also 9A J. Plitt et al., Couch on Insurance (3d Ed. Rev. 2023) § 129:7 ("[i]n relation to the first prong of the [property damage] definition, property suffers physical, tangible injury when the property is altered in appearance, shape, color, or in some other material dimension").

It is clear that damage to nondefective property in the form of rot or mold caused by water intrusion would be property damage within the terms of the policy language. See *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 782 ("under the plain language of the commercial general liability policy, water and mold damage to portions of the insured's project, beyond the defective work itself, would qualify as 'physical injury to tangible property' "); see also *Assurance Co. of America* v. *Lucas Waterproofing Co.*, 581 F. Supp. 2d 1201, 1209 (S.D. Fla. 2008) ("given that damage to the buildings included water in the soffit beams, mildew, stucco damage, and peeling and bubbling paint, which constitute 'property damage' in this case, it is probable that at least part of the state court judgment is attributable to repairing damage to other parts of the property caused by [the waterproofing company's] defective work").[10]

This case, however, presents the question of whether the extrinsic documents suggesting that water was being directed between the two foam layers and collecting in the soffit areas constitutes property damage, in other words, whether the notification to the insurer of the mere presence of water is sufficient to trigger a duty to defend. The plaintiff has not presented this court with any case law holding that the presence of water, in the absence of actual damage, amounts to covered physical damage.[11]

We also find the decision in *Amtrol, Inc.* v. *Tudor Ins. Co.*, Docket No. Civ.A.01-10461 (DPW), 2002 WL 31194863 (D. Mass. September 10, 2002), persuasive. In that case, the defendant insurer had issued a standard form commercial general liability policy to its insured, Amtrol, Inc. (Amtrol), a corporation that manufactures and sells residential water heaters. See id., *1. The water heaters began to develop "leaks in various locations in their coil assemblies causing hot water to leak from the units." Id., *2. In seeking coverage, Amtrol con-

tended that the leakage of water from the water heater constituted property damage. See id., *5. In other words, it contended that "the unwanted presence of water within the home or building in which the [water heater] was installed is per se physically injurious." Id., *6. The court disagreed, stating that, "in order to meet the physical damage requirement, one must show that the water has somehow exacted a physical harm upon tangible property that required remediation or otherwise diminished the value of the property itself. . . . *A leak that results in no damage beyond the mere presence of water that can be removed or evaporates without harm does not constitute property damage.*" (Citation omitted; emphasis added.) Id.

In the present case, the extrinsic documents provided by the plaintiff to the defendant, at most, alerted the defendant to the mere presence of water, without the necessary resulting physical injury to tangible property.[12] We conclude that the notification of the mere presence of water, without some corresponding physical damage, did not provide the defendant with "actual knowledge of facts establishing a reasonable possibility of coverage" because the presence of water does not constitute property damage within the terms of the policy.

Accordingly, the defendant did not have a duty to defend the plaintiff in the underlying litigation, and the court properly rendered summary judgment in favor of the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The June 29, 2018 supplemental disclosure of expert witness also stated: "It is expected that Mezoff will testify consistent [with] his review of the project and experience in the areas of residential design, construction, and construction process. Mezoff is further expected to testify with respect to his review and examination of the operative pleadings, discovery responses, documents produced in this litigation, and his personal inspection of the project site."

The disclosure stated that Mezoff was expected to testify to the following facts and opinions: "(I) the work performed, both completed and incomplete, (1) was not performed in substantial compliance with the construction contract, plans and specifications, and customary practices applicable to residential construction, including sequencing and process, (2) was not performed timely and in a reasonable and workmanlike manner, and (3) demonstrated a failure by the plaintiff to understand the specific requirements and challenges presented by 'modern' architectural design; (II) the plaintiff failed to properly request and obtain change orders in accordance with the requirements of the contract; (III) the plaintiff failed to properly and timely identify and secure items specified [in] the contract and attached schedules and specifications; (IV) the plaintiff failed to properly plan for the changes that it made to the plans and/or design during the construction phase to ensure the plaintiff would meet contract deadlines; [and] (V) the costs of completion of, and corrections to, the work by the [L'Henaffs] was appropriate, reasonable, and necessary."

[2] In an August 22, 2018 supplement to a motion for continuance filed in the underlying litigation, the plaintiff's counsel states that "[t]he plaintiff and its experts are currently investigating the claims brought up at the deposition of [the L'Henaffs'] new expert [Mezoff] that took place on August 1, 2018. The plaintiff requires sufficient time to inspect, investigate and obtain expert testimony."

[3] The arbitration award, which was attached as an exhibit to the plaintiff's

memorandum of law in support of its motion for summary judgment in this case, provided that the plaintiff "shall also recover reasonable [attorney's] fees and costs of collection, as provided in the contract, in an amount to be determined after further argument on that sole issue on the basis of the affidavit submitted by [the plaintiff's] counsel with its posthearing brief, all as previously agreed by counsel. Counsel shall confer and, within five (5) business days of receipt of this award, shall advise the undersigned whether they want said argument to proceed by conference call or Zoom conference and state at least two proposed dates/times for said argument."

[4] On appeal, the plaintiff does not claim that the court erred in rendering summary judgment in favor of the defendant on count two of its complaint.

[5] The defendant did not argue, either before the trial court or in the present appeal, that alleged negligent work of the plaintiff could not give rise to an "occurrence" under the insuring agreement. See *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 776 ("because negligent work is unintentional from the point of view of the insured, we find that it may constitute the basis for an 'accident' or 'occurrence' under the plain terms of the commercial general liability policy"). Accordingly, we focus on the property damage requirement of the insuring agreement.

[6] The defendant asserts, as an alternative ground for affirmance, that certain policy exclusions bar coverage. Because we affirm the judgment on the basis that the court properly determined that there was no property damage within the terms of the policy, we need not reach the defendant's proposed alternative ground for affirmance.

[7] In its appellate brief, the plaintiff contends that "the trial court erred when it required the plaintiff to demonstrate that information outside of the counterclaims must provide the defendant with 'actual knowledge of a coverable claim' . . . instead of sufficient knowledge demonstrating the possibility of a covered claim." (Citation omitted.) Although the trial court in one instance in its memorandum of decision used the language "actual knowledge of a coverable claim," it correctly quoted and applied the law stating that "an insurer must provide a defense when 'it has actual knowledge of facts establishing a reasonable possibility of coverage.' " Furthermore, because our review is plenary, the trial court's choice of words is immaterial to our analysis. Accordingly, we reject the plaintiff's contention.

[8] The plaintiff relies on *County Wide Mechanical Services*, *LLC* v. *Regent Ins. Co.*, Docket No. 3:20-CV-1135 (SVN), 2022 WL 1514941 (D. Conn. May 13, 2022), to illustrate the principle that, if an allegation of the complaint falls even possibly within coverage, the insurer must defend the insured. We find this case distinguishable because the question before the court in that case was whether certain building systems, alleged to have been affected by the defective work of a company that installed a heating, ventilation, and air conditioning (HVAC) system, constituted nondefective property. See id., *6.

Specifically, the court considered the following allegation made in underlying litigation against the HVAC company: "[a]s a result of the failures [of the HVAC system], The Saybrook has replaced multiple compressors in the HVAC system *and several circuit boards, valves, and other components.*" (Emphasis added; internal quotation marks omitted.) Id., *1. The court in the ensuing insurance coverage dispute determined that "the allegation plausibly states that the allegedly damaged circuit board, valves, and other components are external to the HVAC system because the phrase 'in the HVAC [s]ystem' appears to modify only the phrase 'multiple compressors,' and not the phrase 'circuit boards, valves and other components.' " (Emphasis omitted.) Id., *6. The court also stated that the allegation that The Saybrook had " 'suffered damages' " as a result of the HVAC company's defective work was "not alleged to have been limited to the HVAC system itself." Id. Accordingly, the court concluded that the "underlying complaint plausibly suggests that its injury includes damage to nondefective property beyond the HVAC system—circuit boards, valves, and other components— which raises the possibility that [the underlying plaintiff's] injury constitutes 'property damage' as defined by the insurance policy . . . ." Id.

[9] In response to the defendant's argument, the plaintiff, in its appellate reply brief, argues that factual uncertainty exists with regard to the defendant's duty to defend. The plaintiff relies on *Nash Street*, *LLC* v. *Main Street America Assurance Co.*, supra, 337 Conn. 1, wherein our Supreme Court stated that "[b]ecause all that is necessary to trigger an insurer's duty to defend is a possibility of coverage, any uncertainty as to whether an alleged injury is covered works in favor of providing a defense to an insured, and uncertainty may be either factual or legal." Id., 10. The court explained that

"[f]actual uncertainty arises when it is unclear from the face of the complaint whether an alleged injury occurred in a manner that is covered by the policy." Id. The court also gave an example of factual uncertainty, explaining that if a policy was active for the 2019 calendar year and the underlying complaint did not specify when the alleged injury occurred, that would constitute an example of factual uncertainty "because it is impossible to know from the face of the complaint whether the alleged injury took place during the coverage period." Id.

We disagree with the plaintiff that the revised counterclaim gives rise to factual uncertainty. The counterclaim does not allege property damage. It is not that the allegations of the revised counterclaim are uncertain and require clarification but that they are altogether insufficient.

[10] During oral argument before this court, the court ordered the parties to submit supplemental briefs addressing *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 95 A.3d 1031 (2014) (*Travelers*), in which our Supreme Court concluded that a complaint in underlying litigation triggered The Netherlands Insurance Company's duty to defend, under a commercial general liability policy, a company contracted to perform masonry for the construction of a law library. See id., 716–17. The complaint in the underlying litigation in that case alleged that "[d]uring the months and years following completion of the project and occupancy by the state, the state began to experience problems with water intrusion into the [law] library." (Internal quotation marks omitted.) Id., 744. The complaint alleged that numerous defects had "caused tangible and physical harm to the [law] library . . . ." (Internal quotation marks omitted.) Id., 745.

In its supplemental briefing, the plaintiff relies on the court's statement in *Travelers* in rejecting the argument that repeated water intrusions constituted one occurrence, that "the occurrence is the defective work, whereas the property damage—in this case water intrusion—results from that occurrence." (Internal quotation marks omitted.) Id., 746. The plaintiff argues that *Travelers* is not definitive but "lends some support" to the plaintiff's position that "water collecting in areas where it is not intended to be is itself property damage." We conclude that the court's statement, considered in context, does not impact our analysis of the issue presented in this case. As the plaintiff acknowledges, the complaint in the underlying litigation in *Travelers* "indicated that the water intrusion had in fact caused physical damage to property," and the *Travelers* decision addressed the question of whether the property damage that had been alleged extended into certain policy periods, not whether property damage had been alleged at all.

[11] Although not directly on point, our Supreme Court's recent decisions in *Connecticut Dermatology Group, PC* v. *Twin City Fire Ins. Co.*, 346 Conn. 33, 288 A.3d 187 (2023) (*Connecticut Dermatology*), and *Hartford Fire Ins. Co.* v. *Moda, LLC*, 346 Conn. 64, 288 A.3d 206 (2023) (*Moda*), are instructive. In *Connecticut Dermatology*, our Supreme Court considered whether a policy provision covering "direct physical loss of or physical damage to" certain property applied to losses caused by the suspension of an insured's business operations during the COVID-19 pandemic. (Emphasis omitted; internal quotation marks omitted.) *Connecticut Dermatology Group, PC* v. *Twin City Fire Ins. Co.*, supra, 43. The court concluded that "the plain meaning of the term 'direct physical loss of . . . [p]roperty' does not include the suspension of business operations on a physically unaltered property in order to prevent the transmission of the coronavirus. Rather, in ordinary usage, the phrase 'direct physical loss of . . . [p]roperty' clearly and unambiguously means that there must be some physical, tangible alteration to or deprivation of the property that renders it physically unusable or inaccessible." Id., 51. The court further explained that "the virus is not the type of physical contaminant that creates the risk of a direct physical loss because, once a contaminated surface is cleaned or simply left alone for a few days, it no longer poses any physical threat to occupants." Id., 59. In the companion case of *Moda*, our Supreme Court relied on its holding from *Connecticut Dermatology* to conclude that the losses the insured had suffered did not result from any tangible physical alteration to its stock or property and, thus, there was no coverage for such losses under the policy language. See *Hartford Fire Ins. Co.* v. *Moda, LLC*, supra, 73. We find the reasoning in *Connecticut Dermatology* and *Moda* relevant to the present case because the presence of the virus, like the presence of water, does not suggest a tangible alteration to nondefective property.

[12] The present case is different from *B&W Paving & Landscape, LLC* v. *Employers Mutual Casualty Co.*, Docket No. 3:21-cv-01624 (JBA), 2022 WL 17716492 (D. Conn. December 15, 2022). In that case, the underlying com-

plaint broadly alleged property damage caused by the insured plaintiff. See id., *2. When the complaint was considered together with an expert report concluding that defects in the plaintiff's work caused damage to other, nondefective work, the insurer's duty to defend was triggered. See id., *3.

———————————————